**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YUE YU, RONALD OSCHER, DONALD FAISTL, and STANLEY ARROW,<br>on behalf of themselves and all others similarly situated,<br><br>       **Plaintiffs,**<br><br><br>     -against-<br><br><br>ENERGY PLUS HOLDINGS LLC, and ENERGY PLUS NATURAL GAS LP,<br><br>       **Defendants.** | No. 2:12-cv-2627-JLL-MAH<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Yue Yu, Ronald Oscher, Donald Faistl, and Stanley Arrow bring this action in their individual capacities and on behalf of a class of persons defined below, and allege for their complaint with knowledge as to their own acts and otherwise upon information and belief, as follows:

**OVERVIEW OF DEFENDANTS' WRONGFUL
ACTS AND BASIS OF THIS ACTION**

1.  This lawsuit arises from a fraudulent and deceptive scheme perpetrated by Defendants Energy Plus Holdings LLC and Energy Plus Natural Gas LP (together "Defendants" or "Energy Plus"). Defendants represent that customers will receive competitive market-based rates and savings on their energy bills if they switch from their local utilities or other energy suppliers to Energy Plus. However, these representations are a bait-and-switch trap. Within one or two billing cycles, Defendants routinely hike up their customers' rates well above the market – often by as much as 150% or more. After an initial teaser (usually only effective for one month), Energy Plus' rates are almost always substantially higher than the market. A customer who converts to Energy Plus has no

1

actual possibility of savings and may even end up paying two to three times more for electricity or natural gas than what he or she did before.  Instead of benefitting from moving to Energy Plus, a typical customer loses out – often paying hundreds or thousands of dollars more per year than before the switch. Thus, Defendants deceptively cause their customers to pay considerably more for energy supplies than they otherwise would have paid.

2.      Plaintiffs Yue Yu, Ronald Oscher, Donald Faistl, and Stanley Arrow, on behalf of similarly situated customer-classes they seek to represent, bring this lawsuit to redress Defendants' unlawful and unconscionable consumer practices in New Jersey and the other states where Energy Plus does business – including Connecticut, Illinois, Maryland, Massachusetts, New York, Ohio, Pennsylvania, and Texas.

3.      Defendants' practices emerge from and take advantage of the deregulation of the energy supply markets in New Jersey and the other states in Energy Plus' supply area – including Connecticut, Illinois, Maryland, Massachusetts, New York, Ohio, Pennsylvania, and Texas.  Under these states' deregulation laws, the supply portion of a consumer's electric or natural gas bill is separated from the delivery portion. In theory, with the supply portion open to competition, customers can freely shop around for the best price on their energy supplies. But, by engaging in its bait-and-switch scheme, Energy Plus subverts the consumer-friendly purpose of these laws and prevents its customers from making a free, informed choice.  In reality, customers would be far better off staying with their local utilities or another supplier than switching to Energy Plus.

4.      Plaintiffs bring this action on behalf of two subclasses of Defendants' New Jersey consumers under (i) the New Jersey Consumer Fraud Act ("NJCFA" or "CFA"), N.J.S.A. § 56:8-1, *et seq.*, and (ii) the New Jersey Plain Language Act, N.J.S.A. § 56:12-1, *et seq.*  (*See* ¶ 72, <u>infra</u>)  As to the New Jersey classes, Energy Plus' conduct violates the NJCFA generally, as well as specific

2

statutory and regulatory provisions that constitute automatic CFA violations. In particular, N.J.S.A. § 56:8-2.2 directly prohibits the type of bait-and-switch pricing scheme perpetrated by Energy Plus: deceptively advertising goods or services at a price it does not actually intend to sell. Here, Energy Plus misleadingly creates the impression of energy savings it is unable or unwilling to provide and that can never be realized by the consumer. Defendants do not disclose the critical facts that nullify their price claims.

5. This misconduct also supplies the basis for Plaintiffs' two additional subclasses asserting multi-state class claims for (i) breach of the covenant of good faith and fair dealing, (ii) breach of contract, and (iii) unjust enrichment. (*See* ¶ 72, infra, defining the multi-state subclasses).

6. Through its deceptive, unconscionable, and unlawful practices, Defendants bilk the classes out of millions of dollars per year. Energy Plus currently has approximately 150,000 customers in 9 states. Upon information and belief, the New Jersey class alone consists of thousands or tens of thousands of current and former customers with variable-rate plans in New Jersey, each of whom has sustained damages of as much as hundreds or thousands of dollars annually.

7. Plaintiffs bring this class action under Fed. R. Civ. P. 23 to recover damages, statutory penalties, and other relief for themselves and the class of Energy Plus customers who have suffered damages from Defendants' imposition of unreasonable and exorbitant energy prices in violation of the company's representations. Only a class action will provide Plaintiffs and the class with any possibility of relief. Plaintiffs and the class are therefore entitled to a class-wide remedy.

## **JURISDICTION AND VENUE**

8. This Court possesses federal subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(d) for the following reasons:

    (a) the number of members of the proposed Plaintiff class is 100 or more;

(b)      there is at least minimal diversity of citizenship between the Plaintiff class (named and unnamed) and the Defendants. Defendants are headquartered and have their primary place of business in Pennsylvania while Plaintiffs and the class members are residents of New Jersey and several other states;

(c)      the amount in controversy – which may be calculated by aggregating the claims of the class members – exceeds the sum or value of $5 million.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

10.     The wrongful acts Plaintiffs complain of – Defendants' imposition of excessive and unreasonable rates in violation of their representations – occurred and were carried out in this District and their effects were felt in this District.

## THE PARTIES

11.     **Plaintiff Yue Yu** is a resident of Kearny, New Jersey.  In or about September 2011, Ms. Yu enrolled as an Energy Plus customer as a result of the company's deceptive representations and began to receive her electricity and natural gas supplies from Energy Plus.  Because of the conduct alleged in this case, Ms. Yu has incurred over $200 in overcharges from November 2011 to the present – ranging up to about 70% above market rates each month. When Ms. Yu finally discovered Defendants' billing practices and the fact that she was paying significantly more than she would be as a customer of her local utility company, PSEG, she switched back to PSEG.

12.     **Plaintiff Ronald Oscher** is a resident of Ridgewood, New Jersey. Because of the company's deceptive representations concerning competitive electricity rates, Mr. Oscher enrolled with Energy Plus in or about December 2010; Energy Plus began to supply his electricity in or about February 2011.  From March 2011 until April 2012, Energy Plus increased Mr. Oscher's rates by 45%. By comparison during the same period, PSEG's rates declined by 9%. Mr. Oscher has incurred over $600 in overcharges as a result of the conduct alleged in this case. When Mr. Oscher finally

4

discovered that Energy Plus had been charging increasingly high rates that far exceeded the market rates each month, he switched back to PSEG.

13.     **Plaintiff Donald Faistl** is a resident of Middletown, New Jersey.  In or about August 2011, as a result of the company's deceptive price claims, Mr. Faistl switched his electricity and natural gas supplier to Energy Plus.  He began receiving service from Energy Plus in October 2011.  As an Energy Plus customer, Mr. Faistl has paid up to 36% more for energy supplies than he would have with his public utility and never realized any savings after the first month.  He has incurred hundreds of dollars of overcharges with Energy Plus.

14.     **Plaintiff Stanley Arrow** is a resident of Wayne, New Jersey.  In or about March 2012, Mr. Arrow switched to Energy Plus as a result of its deceptive representations regarding its electricity rates.  He began receiving electricity from Energy Plus in April 2012.  In a mere three months of billing, after the initial teaser, Energy Plus overcharged Mr. Arrow by a total of $199.40 as compared to his previous provider PSEG – up to 41.7% more per month.   When Mr. Arrow discovered the disparity in Energy Plus' prices, he switched back to PSEG in or about July 2012; his Energy Plus service was discontinued and his PSEG service reinstated in August 2012.

15.     **Defendant Energy Plus Holdings LLC**, a corporation with its principal place of business in Philadelphia, Pennsylvania, is licensed as an electricity supplier in New Jersey – license number ESL-0087.  Defendant Energy Plus Holdings LLC is also licensed as an electricity supplier in the other states where the company does business.

16.     **Defendant Energy Plus Natural Gas LP,** a corporation with its principal place of business in Philadelphia, Pennsylvania, is licensed as a natural gas supplier in New Jersey – license number ESL-0100.  Defendant Energy Plus Natural Gas LP is also licensed as a natural gas supplier in New York, Maryland, and Ohio.

17.     Defendants act in concert to commit the acts alleged herein.  Defendants bait customers such as Plaintiffs and the class members to obtain their electricity and natural gas supplies from Energy Plus and then fail to deliver the promised market rates.

## FACTUAL ALLEGATIONS

18.     In 1999, New Jersey deregulated energy supply in the state.  Customers may now purchase electricity and/or natural gas through "alternative" third-party suppliers while continuing to obtain delivery from their local public utilities. These private suppliers are not subject to oversight and regulation by the New Jersey Board of Public Utilities (BPU).  For example, by law, the BPU has primary jurisdiction over all disputes concerning service, billing, and payment by public utilities but not private suppliers such as Energy Plus.  In contrast to public utilities, the BPU does not have oversight of the rates charged by Energy Plus.   The intent of the deregulation law is to provide consumer choice and allow competition to drive down customer rates.

19.     Energy Plus takes advantage of the regime in deregulated states such as New Jersey by adopting deceptive and unconscionable business tactics.  Defendants mislead consumers to believe that by switching to Energy Plus they will save money over their local public utilities. Energy Plus further represents that its rates will be tied to market factors and will be competitive with the market. In fact, as many customers soon discover, Energy Plus' representations only hold for the first month of service; after that, their rates skyrocket, completely divorced from prevailing market conditions. At a minimum, Energy Plus exploits ambiguities in its representations and customer agreements to draw consumers in by creating the expectation of competitive prices they will never see. Energy Plus fails to disclose that, on a consistent basis, its regular rates are substantially higher than its competitors and are exorbitant when compared to the market.  While market prices fluctuate up and down, Energy Plus' rates demonstrate a consistent upward trend.

6

20.     Energy Plus markets itself largely through various third-party incentive programs such as frequent flyer programs, hotel rewards programs, cash-back rewards programs, the UPromise college savings plan, and similar rewards plans.

21.     Each of the Plaintiffs received an Energy Plus advertisement in connection with the Continental Airlines One Pass Mileage Program.  Mr. Oscher received his flyer in or about December 2010, Mr. Faistl received his in or about August 2011, Ms. Yu received her flyer in or about September 2011, and Mr. Arrow received his in or about January 2012. The advertisements stated that new Energy Plus customers would receive a certain number of One Pass bonus miles (up to 17,500) for initially signing up with Energy Plus and additional reward miles each month when they paid their energy bills.  As part of its business plan, Energy Plus regularly entices customers into its bait-and-switch scheme using such travel rewards, cash-back offers, and similar incentives.  Energy Plus tells its customers that the company is unique for offering these rewards in connection with its energy supply services.  But the value of these inducements is negligible compared to the amounts by which Energy Plus grossly overcharges its customers through its deceptive conduct.

22.     The advertisements inescapably implied that customers such as Plaintiffs who switched to Energy Plus for electricity and/or natural gas likely would save 10% over their local utility company. Each advertisement contained prominent, bold-face representations at the top of the first page that consumers who switched to Energy Plus would "Save up to 10%" on their energy bills.  Energy Plus substantiated this claim with representations that it had a current supply rate for new customers which was "up to" or "approximately" 10% below that of their local public utilities.   Energy Plus' advertisements routinely indicate that customers can save up to 10-20% on their energy rates.

23.     Energy Plus' mailers also emphasized that switching was "risk free" – such that customers would "Enjoy the same service without risk, fees, or long term commitment"; and that there are "no

7

hidden fees, no long-term commitments," and no disruptions of the service the consumer is already receiving from his or her public utility. These statements are misleading. They fail to indicate that Energy Plus' rates are generally substantially higher than its competitors and that new customers are virtually assured of receiving far more expensive service.

24.     Energy Plus touts its energy supply rates and the possibility of savings as a primary incentive to switch providers. Ordinary consumers who view Energy Plus' advertisements would believe that long-term savings on their energy bills were very likely. They would have no reason to suspect that its prices typically far exceed the market and that savings are illusory.

25.     The misleading impressions created by Energy Plus are not dispelled by any disclaimers contained in the mailers. Buried within the ads, either far down or on the reverse side, Energy Plus appends a prolix, fine-print disclaimer again verifying its savings claim by representing that its "initial" rate is approximately 10% lower than those of comparable public utilities. While the disclaimer indicates that Energy Plus' rates are variable and that future savings are not guaranteed, nowhere does Energy Plus disclose that, after the first-month teaser, its rates will always substantially exceed its competitors and that savings will never again happen. Consumers who read the disclaimer would reasonably anticipate that savings were indeed probable; and that although both Energy Plus' rate and that of the public utilities would fluctuate, the comparison between them would usually vary by a small amount. For example, a customer's savings might sometimes be closer to 5% and in some months the prices might be roughly even. But an ordinary customer would not suspect the truth: that Energy Plus rates would go only in a single direction compared to public utilities – ever skyward.

26.     After receiving Energy Plus' flyer in the mail, Plaintiffs Yu and Oscher visited the company's website where they viewed additional representations about the company's service and prices. The site reemphasized that Energy Plus' rates were competitive and that customers could save up to 10%.

8

27.     Energy Plus' advertisements, website, and customer agreements indicate that its rates are market-based and highly competitive.  Energy Plus uniformly and consistently represents that its rates are "competitive" and reflective of market conditions and that the company will provide "the best competitive rate possible." For example, the company represents in its mailers that "Energy Plus offers a market-rate product, which means we buy electricity every day on the open market." Energy Plus' website states that its rates are "market-driven" -- that they are "based on market prices and other factors" and are calculated monthly using an average in the customer's region.  In this market-driven process, the Energy Plus website represents, the company scours the market to find the best rates for its customers: "Our approach is to purchase energy from each of these markets on a daily and monthly basis, which allows us to incorporate the most up-to-date energy costs from each market into our rates." The clear implication is that Energy Plus is purchasing energy at market rates, where vigorous competition ensures the lowest possible prices for its customers.

28.     Energy Plus presents the company's rewards programs in a manner leading consumers to believe that they will receive valuable incentive benefits while at the same time realizing competitive energy prices – a win-win for the customer.  Its website promises to "[p]ut money back in your pocket."  Energy Plus also markets its products as "competitive," states that its rates "reflect the state of each power market," and promises that "we're constantly taking advantage of the best market prices."  It states that the company's rates are tied to market prices, specifically: "We use an average for your specific region to calculate the cost for each month of service."  As the Connecticut Attorney General concluded after an inquiry into consumer complaints against Energy Plus (*see* Ex. A, Petition for Investigation, attached hereto and incorporated by reference), a reasonable consumer viewing such representations "would naturally assume that Energy Plus' electric rates would be competitive with other market participants and the rewards program would be an additional benefit to the

9

competitive electric rates – setting Energy Plus apart from those other competitive suppliers."

29.     While Energy Plus indicates that its rates may *at times* be higher than public utilities, it misleadingly suggests that its rates will generally be competitive with or undercut the market.  In order to maintain its customer base, even after consumers may suspect they are being had, Energy Plus' website advises customers to take the long view: "in order to make an informed comparison to competitive offers, customers should average their bills over the course of several months or seasons, rather than taking a snapshot of just one month. Our goal is to be competitive with other energy suppliers over the long run while offering valuable rewards."

30.     When confronted about the company's billing practices, Energy Plus salespeople and representatives also attempt to reassure customers that the company's prices are "competitive" and will average out over time.

31.     But as most customers eventually realize, the long view is a hoax and the rewards programs touted by the company are a mere pittance.  After the first month with Energy Plus, customers' rates will never reflect going market prices.  Like playing in a casino using a stacked deck, a customer who sticks with Energy Plus hoping to break even will only sink deeper into the quicksand and enable the company to further line its pockets at its customers' expense. In fact, Energy Plus' rates are not competitive with other suppliers or in line with market factors.  Customers who switch to Energy Plus can wind up paying as much as two to three times above the going rate in the area. The company's customers in New Jersey and nationwide regularly complain that Energy Plus' rates far exceed that of any other supplier, that their rates have doubled or more after the first month, and that they are often being overcharged by more than 100% as compared to remaining with their local utilities.

32.     As the Connecticut Attorney General determined (*see* Ex. A), consumers who enroll in Energy Plus for competitive rates and incentive rewards are grossly misled: "In fact, customers who

sign up with Energy Plus end up paying prices **that are far higher** than those charged by other electric suppliers or the standard service rate.  Any 'savings' or 'rewards' that customers may receive through the awards program are far **outweighed by the exorbitant prices** that Energy Plus charges for its electric supply."

33.    Moreover, Energy Plus' claims that its rates are highly market-sensitive and are set on a monthly basis are undermined by the fact that the prices it charges its customers often remain the same from month-to-month even in periods where market costs decline.

34.    Additionally (especially since the onset of class litigation regarding Energy Plus' pricing scheme), when Plaintiffs and other customers complained to the company about its rates, it often offers them discounts and rebates – such as offering to implement its commercial rates.   Energy Plus does not advertise or disclose that these rates are available to residential customers.  The company's clandestine discount offers are indications that the regular rates it charges are arbitrary and unreasonable and are not set in good faith.

35.    Energy Plus does not disclose these material facts to its customers but encourages the false perception that switching to and remaining with Energy Plus will mean savings to the cost-conscious consumer.  It is false and misleading to create the impression of fair market pricing and potential savings, with a disclaimer that the rates are variable and may *at times* range higher than the competition, when in fact the rates dramatically increase almost as soon as the customer enrolls and are *always significantly* higher.

36.    The limited, ambiguous, and overly dense and confusing disclaimers contained in Energy Plus' advertisements and boilerplate form contracts are wholly insufficient to communicate the material facts regarding its price claims to consumers, or that any material price increases will be applicable to both electric and gas service.

11

37.     Contrary to Defendants' claims of risk-free, no-commitment switching, once consumers have taken the time and effort to enroll with Energy Plus, it is not a simple, pain-free matter to switch back to another provider. The agreement continues on a month to month basis until the customer (or Energy Plus) affirmatively cancels it. To do so after the first month of service, the customer must provide the defendants with 30 days advance written notice. If it is canceled during the first month, customers "forfeit some of the rewards" offered to them. Under either scenario, customers must also take the time to find another energy and natural gas provider.

38.     Energy Plus' various representations regarding price are materially misleading to consumers and have the capacity to mislead.  Had Energy Plus provided honest information and revealed it would charge exorbitant rates after the first month, no reasonable consumer would ever choose it as an energy supplier.  No reasonable consumer would switch to Energy Plus knowing that: its claims of possible savings would not apply after the first month, there was no actual possibility of savings after the first month, and its rates were not competitive but would almost always be substantially higher than its competitors.

**Plaintiff Yue Yu's Experiences With Energy Plus**

39.     After viewing the company's above-described advertisements and website, Plaintiff Yue Yu submitted an online application on or about September 19, 2011 to move to Energy Plus as her electricity and natural gas supplier. The company accepted. She began electricity service in or about November 2011 and natural gas service in or about December 2011.

40.     For the first month of Energy Plus service, Ms. Yu received a discount of almost 10% as compared to her former provider PSEG. Thereafter, the company jacked up its rates and charged her from 30 to71% more than PSEG each month, as represented in the following chart:

| *Electricity* | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Projected Apr-12 |
|---|---|---|---|---|---|---|
| Total kWh | 591 | 549 | 574 | 529 | 511 | 529 |
| PSEG-Total charge | $66.82 | $61.98 | $67.98 | $64.92 | $58.55 | $64.92 |
| Energy Plus Total charge | $60.71 | $87.53 | $91.52 | $84.34 | $81.47 | $84.34 |
| PSEG per kWh | $0.113063 | $0.112896 | $0.118432 | $0.122722 | $0.114579 | $0.122722 |
| Energy Plus per kWh | $0.102724 | $0.159435 | $0.159443 | $0.159433 | $0.159432 | $0.159433 |
| Energy Plus vs. PSEG | -9.14% | 41.22% | 34.63% | 29.91% | 39.15% | 29.91% |
| Overcharge | | $27.89 | $25.69 | $21.20 | $25.02 | $21.20 |

| *Gas* | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Projected Apr-12 |
|---|---|---|---|---|---|---|
| Total Therms | | 95.432 | 159.017 | 125.205 | 71.993 | 70 |
| PSEG-Total charge | | $57.46 | $95.55 | $57.08 | $43.26 | $42.00 |
| Energy Plus Total charge | | $51.84 | $141.21 | $97.64 | $57.78 | $56.00 |
| PSEG per therm | | $0.602104 | $0.600879 | $0.455892 | $0.600892 | $0.600000 |
| Energy Plus per therm | | $0.543214 | $0.888018 | $0.779841 | $0.802578 | $0.800000 |
| Energy Plus vs. PSEG | | -9.78% | 47.79% | 71.06% | 33.56% | 33.33% |
| Overcharge | | | $50.13 | $44.53 | $15.94 | $15.37 |
| | | | | | | |
| Total overcharge | | $27.89 | $75.82 | $65.72 | $40.96 | $36.57 |

41.     As seen in the above chart, in the second month of its contract with Ms. Yu, Energy Plus raised her electricity rate by more than 55% even though PSEG's rate went down. Energy Plus' rate remained virtually constant over the next few months (and substantially higher than PSEG's) even though PSEG's rate fluctuated.  For example, from February to March 2012, PSEG's rate dropped by almost a full cent per kilowatt hour, or nearly 10%; Energy Plus' rate went down by a mere $.000001, or one-ten thousandth of a penny.

42.     As to natural gas, Energy Plus hiked its rate up by more than 63% in the second month even as PSEG's rate went down.  In February 2012, the company charged Ms. Yu 71% more than PSEG.

13

43.     In total, during five months of electricity billing and four months of natural gas billing (after the first month teaser), Energy Plus overcharged Ms. Yu by about $247 as compared to PSEG.

44.     Energy Plus' misstatements and omissions in its mailers and on its website caused Ms. Yu injury because she believed that she would be charged less for electricity than she was actually charged by Energy Plus. Ms. Yu would not have enrolled in Energy Plus' service but for Defendants' deceptive and unconscionable marketing and business practices. Had Ms. Yu known that the rates she would be charged by Energy Plus were in fact substantially higher than the rates she was paying her previous energy supplier, PSEG, she would not have enrolled with Energy Plus. Ms. Yu has sustained economic injury caused by Defendants' misstatements and omissions.

45.     Similarly, the other members of the class have routinely paid substantially more for Energy Plus service as compared with their previous suppliers and have not received the competitive rates and savings they have been told to expect by the company.

**Plaintiff Ronald Oscher's Experiences With Energy Plus**

46.     After observing the company's above-described advertisements and website, Mr. Oscher submitted an application to switch to Energy Plus in or about December 2010.  He began electricity service with Energy Plus in or about February 2011 and received his first bill in March 2011.

47.     Mr. Oscher initially received a 13% reduction in his electricity rate for the first month of service, followed by a 5% reduction during the second month. Subsequently, the company jacked up its rates, charging up to 41% higher than PSEG rates, as represented in the following chart:

|  | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 |
|---|---|---|---|---|---|---|
| *Electricity* |  |  |  |  |  |  |
| Total kWh | 1793 | 1756 | 1506 | 1816 | 2113 | 2588 |
| PSEG-Total charge | $226.29 | $216.52 | $177.69 | $210.28 | $246.28 | $314.72 |
| Energy Plus Total charge | $197.61 | $204.80 | $201.43 | $240.94 | $280.35 | $343.37 |
| PSEG per kWh | $0.126210 | $0.123300 | $0.117988 | $0.115793 | $0.116555 | $0.121607 |

14

| Energy Plus per kWh | $0.110212 | $0.116626 | $0.133752 | $0.132676 | $0.132679 | $0.132677 |
| Energy Plus vs. PSEG | -12.68% | -5.41% | 13.36% | 14.58% | 13.83% | 9.10% |
| Overcharge | | | $23.74 | $30.66 | $34.07 | $28.65 |

| | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 |
| --- | --- | --- | --- | --- | --- | --- |
| *Electricity, continued* | | | | | | |
| Total kWh | 1373 | 916 | 2516 | 1714 | 2323 | 1755 |
| PSEG-Total charge | $165.84 | $103.93 | $284.72 | $193.69 | $266.60 | $211.03 |
| Energy Plus Total charge | $182.17 | $121.53 | $401.12 | $273.27 | $370.36 | $279.81 |
| PSEG per kWh | $0.120787 | $0.113461 | $0.113164 | $0.113005 | $0.114765 | $0.120245 |
| Energy Plus per kWh | $0.132681 | $0.132675 | $0.159428 | $0.159435 | $0.159431 | $0.159436 |
| Energy Plus vs. PSEG | 9.85% | 16.93% | 40.88% | 41.09% | 38.92% | 32.59% |
| Overcharge | $16.33 | $17.60 | $116.40 | $79.58 | $103.76 | $68.78 |

| | Mar-12 | Apr-12 |
| --- | --- | --- |
| *Electricity, continued* | | |
| Total kWh | 1518 | 1479 |
| PSEG-Total charge | $182.69 | $169.68 |
| Energy Plus Total charge | $242.01 | $235.80 |
| PSEG per kWh | $0.120349 | $0.114726 |
| Energy Plus per kWh | $0.159427 | $0.159432 |
| Energy Plus vs. PSEG | 32.47% | 38.97% |
| Overcharge | $59.32 | $66.12 |

48.     As seen in the above chart, the company charged rates that were between 9 to 41% higher than PSEG's rates between April 2011 and April 2012. In addition to charging rates that were substantially higher than PSEG's rates, Energy Plus' rates remained virtually constant over the next few months while PSEG's rates fluctuated.  For example, with the exception of a 20.16% rate hike from October to November 2011 (at the same time that PSEG's rate dropped), Energy Plus' rates changed by less than 1% between June 2011 and April 2012.

49.     Approximately one month before Mr. Oscher terminated his service with Energy Plus, his wife contacted the company to complain about its excessive rates.  In response, the company offered to put the Oschers on a lower rate plan.  On May 30, 2012, Mr. Oscher contacted Energy Plus by email at njsupport@energypluscompany.com to seek an explanation for its rates over his term as a

15

customer – specifically: "why my rates have increased so much while the electricity supply market price has gone down.  Why do the PSEG rates fluctuate (with market I presume) while the Energy Plus rates increase in steps and remain steady until the next step change increase?"  Mr. Oscher attached a version of the above comparison chart to the email, verifying that while PSEG's rates varied up and down month-by-month, Energy Plus' rates showed large step increases every few months and (except for tiny fluctuations of mere thousandths of a cent) went only in one direction – consistently higher.  Mr. Oscher never received a reply from Energy Plus.

50.    Energy Plus' misstatements and omissions in its mailers and on its website caused Mr. Oscher injury because he believed that he would be charged competitive electricity rates based on the market. But for Defendant's deceptive and unconscionable marketing and business practices, Mr. Oscher would not have enrolled in Energy Plus' service. Had Mr. Oscher known that the rates he would be charged by Energy Plus were in fact substantially higher than the rates he was paying with PSEG, he would not have switched electricity suppliers. Mr. Oscher has sustained economic injury caused by Defendants' misstatements and omissions.

51.    Similarly, the other members of the class have routinely paid substantially more for Energy Plus service as compared with their previous suppliers and have not received the competitive rates and savings they have been told to expect by the company.

**Plaintiff Donald Faistl's Experiences With Energy Plus**

52.    Plaintiff Donald Faistl received an advertisement from Defendants in or around August 2011, promising substantial savings over his local utility – up to 10% – and 17,500 miles from Continental Airlines if he enrolled in the Defendants' services. In reliance on Defendants' representations of "competitive" rates and potential savings, Mr. Faistl completed an online application to switch to Energy Plus on or about August 21, 2011. That application was accepted

16

by Defendants on August 21, 2011 and Mr. Faistl was provided with confirmation number 454e18e. Mr. Faistl then began receiving Energy Plus electric and gas service in October of 2011. Up until October 2011, Mr. Faistl had been a customer of Dominion Energy.

53.     While Plaintiff Faistl did realize nominal initial savings (which were short of the promised "up to 10%"), within a month he began paying as much as 36% more for his Energy Plus electrical service and over 10% more for his gas service. In the first few months of being an Energy Plus customer, he paid significantly more for the new services as compared to what he would have paid based on Jersey Central Power & Light ("JCP&L"), New Jersey Natural Gas ("NJNG") rates or the rates charged by other third party energy suppliers rates.

54.     As with the other Plaintiffs, Mr. Faistl's rates spiked after the first month, generally stayed the same or went up from month to month regardless of market conditions, and fluctuated without a discernable correlation to market prices.

55.     Energy Plus' misstatements and omissions caused Mr. Faistl injury because he believed that he would be charged substantially less than he was actually charged by Energy Plus and would receive potential savings on his energy bills. But for Defendant's deceptive and unconscionable marketing and business practices, Mr. Faistl would not have enrolled in Energy Plus' service. Had Mr. Faistl known that the rates he would be charged by Energy Plus were in fact substantially higher than the rates he would have been paying with his local utilities, he would not have switched electricity and natural gas suppliers. Mr. Faistl has sustained economic injury caused by Defendants' misstatements and omissions.

56.     Similarly, the other members of the class have routinely paid substantially more for Energy Plus service as compared with their previous suppliers and have not received the competitive rates and savings they have been told to expect by the company.

**Plaintiff Stanley Arrow's Experiences With Energy Plus**

57.     Mr. Arrow was sent numerous advertisements by Energy Plus prior to signing up for his service.  These ads came in connection with Gateway computers, Continental Airlines, and other incentive programs. While the mailers offered different rewards, they shared the same fundamental features – the lure of incentive rewards and the implication of available savings on his energy bills, namely the potential to "Save up to 10%."  None of the mailers disclosed that savings were not actually possible after an initial one-month teaser or that Energy Plus' rates were invariably higher than those of the public utilities and its other competitors.  The above-described Continental Airlines mailer finally prompted Mr. Arrow to switch electricity providers.  Although Mr. Arrow observed language in the fine print indicating that Energy Plus' rate was "variable," he did not understand this to obviate the company's representations that 10% savings was attainable and would generally apply.  Rather, he took this to mean that sometimes he might save a bit more than 10%, sometimes a little less.  He did not anticipate uniformly being charged approximately 33 to 40% more with Energy Plus.

58.     On or about March 5, 2012, after viewing the above-described Continental Airlines mailer, Mr. Arrow contacted an Energy Plus customer service representative to enroll in Energy Plus.  He received the confirmation number ECD2547.  Mr. Arrow's Energy Plus service started on or about April 13, 2012 and he received his first bill in May.

59.     As shown in the following chart, Mr. Arrow received an initial discount of 6.87% on his electricity bill for the first month.  After the first month teaser, Energy Plus jacked up the rates and charged him up to 41.7% more than PSEG, for a total overcharge of $199.40 over three months:

|  | May-12 | June-12 | July-12 | Aug-12 |
|---|---|---|---|---|
| *Electricity* | | | | |
| Total kWh | 395 | 876 | 1803 | 1781 |
| PSEG-Total charge | $45.39 | $98.23 | $202.86 | $202.14 |

| Energy Plus Total charge | $42.27 | $131.22 | $287.46 | $283.95 |
|---|---|---|---|---|
| PSEG per kWh | $0.114911 | $0.112135 | $0.112512 | $0.113498 |
| Energy Plus per kWh | $0.107013 | $0.149795 | $0.159434 | $0.159433 |
| Energy Plus vs. PSEG | -6.87% | 33.58% | 41.70% | 40.47% |
| Overcharge | | $32.99 | $84.60 | $81.81 |

60.    In addition to charging rates substantially higher than PSEG, the fluctuations in Energy Plus rates bore little or no relationship to market conditions.  For example, the 40% spike in Mr. Arrow's rate between the first and second month cannot be reasonably justified by market factors.

61.    On or about July 11, 2012, Mr. Arrow contacted Energy Plus to cancel his service and switch back to PSEG.  He spoke to a customer service representative named Jason, who attempted to get Mr. Arrow to stay with Energy Plus by offering him a cheaper rate.  Mr. Arrow declined and received cancellation confirmation number C0234.  His Energy Plus service was discontinued on or about August 10, 2012, forcing him to pay for an additional month of electricity at its unreasonable rates.

62.    Energy Plus' misstatements and omissions in its above-described mailers caused Mr. Arrow injury because he believed he would be charged electricity rates aligned with the market and realize potential savings. But for Defendants' deceptive and unconscionable marketing and business practices, Mr. Arrow would not have enrolled in Energy Plus' service. Had Mr. Arrow known that the rates he would be charged by Energy Plus were in fact substantially higher than the rates he was paying with PSEG, he would not have switched electricity suppliers. Mr. Arrow has sustained economic injury caused by Defendants' misstatements and omissions.

63.    Similarly, the other members of the class have routinely paid substantially more for Energy Plus service as compared with their previous suppliers and have not received the competitive rates and savings they have been told to expect by the company.

## PUBLIC COMPLAINTS AGAINST ENERGY PLUS

64.     The internet and public domain is full of allegations and grievances about Energy Plus'

marketing and pricing scheme which match Plaintiffs' individual experiences as described in this

complaint.  Consumers regularly complain that they were led to expect market-competitive prices

and potential savings by Defendants' advertisements, website, and customer representatives but

that they are instead consistently being charged far more than they would be by their public

utilities – often by double or more.  Over a span of mere months, customers' rates can as much as

double or triple from the initial teaser rate despite no commensurate rise in market prices.[1]

65.     For example, a Connecticut resident complained that while Energy Plus claimed that it

based its rates on the market and that its customers would generally save around 10%, its rates

were actually much higher than any other provider.  All other suppliers had rates between $.0815

and $.1089 per kWh (the latter for a guaranteed renewable rate), but Energy Plus' post-teaser rate

came in at $.14.  Another Connecticut customer who remained with Energy Plus for six months

stated that the company had raised its rates by 10% each month, resulting in rates 50% higher than

the public utility – despite the fact that the electricity market had not gone up in like fashion.

66.     A New York City customer who believed that switching to Energy Plus would mean

saving money complained that its rates were actually more than 2.5 times higher than those

charged by local utility ConEd – 18.8 versus 7 cents per kWh.

67.     In addition, when customers call to complain, they are often offered lower rates to stay

_____

[1]  *See, e.g.*, http://community.upromise.com/t5/Favorite-ways-to-earn/ENERGY-PLUS-SCAM/td-p/14240; http://
www.Consumeraffairs.com/homeowners/energy-plus-company.html;   http://travelsort.com/blog/is-energy-plus-a-
scam;   http://energy-plus-holdings.pissedconsumer.com;   http://ctwatchdog.com/govt/consumer-frustrated-by-
energy-plus-refusing-to-provide-electric-rates-it-charges-in-connecticut;   http://www.ripoffreport.com/directory/
Energy-Plus.aspx;   http://www.complaintsboard.com/complaints/energy-plus-holdings-llc-c236122.html;   http://
www.electricrates.com/35584/energy-plus-scam/ (*See* Ex. B, catalog of sample internet complaints)

with Energy Plus; yet even these discounted rates are significantly above prevailing market prices.

68.     Customers are not the only ones fed up with Energy Plus.  An Energy Plus salesperson posted an internet comment complaining that the company's representatives were trained to mislead consumers about the benefits of switching to Energy Plus; in reality, customers' rates with Energy Plus were routinely two to three times above the market:

> As an Energy Plus salesperson I can tell you that I am torn from the truth while making my commission.  Every customer I have looked at their rates compared to market have double or triple the kwH.  I wish there was something I could do to sue them, training me with misleading the customers on the benefits and ultimately have the prospects being charged an elevated [sic] rate.  With the job market what it is, I needed work, I am embarressed [sic] by the rates customers are charged.  **I am shocked!!!**[2]

### THE CONNECTICUT ATTORNEY GENERAL FORMALLY ACCUSES ENERGY PLUS OF COMMITTING A CONSUMER FRAUD

69.     Based on these grievances as well as complaints made directly to its office, on July 26, 2012, the Connecticut Attorney General filed a petition with the state Public Utilities Regulatory Authority to "commence an investigation into the manner of operation and conduct" of Energy Plus.  (*See* Ex. A) The petition stated that the evidence reviewed – various consumer complaints along with Defendants' marketing and solicitation materials – "appear[s] to demonstrate that Energy Plus has engaged in a pattern of soliciting customers with the direct or implied promise of competitive market-based rates and savings on their electric bills, but then rapidly increasing customers' charges substantially above market rates or the utilities' standard service rates."

70.     The petition further asserts that:

● Energy Plus' advertisements "would lead reasonable consumers to believe they would save money by enrolling with Energy Plus"

● "A reasonable consumer would naturally assume that Energy Plus' electricity rates would be competitive with other market participants and that the 'rewards' program would be an

---

[2] http://www.electricrates.com/35584/energy-plus-scam (a salesman: June 30, 2011 at 6:18 pm)

additional benefit… setting Energy Plus apart from those other competitive suppliers."

● Energy Plus discloses that its rates after the one-month "promotional rate" will be "variable," but it does not disclose what those rates will be.  While most customers expect that the rate will be reflective of market conditions, it is generally much higher than the market, often by 100% or more.

● "It appears that the exorbitant prices charged by Energy Plus are not 'market' prices in the sense that they go up and down in accordance with market conditions, but rather than the prices fluctuate upward only independent of market conditions."

● "**Energy Plus' Marketing Practices Appear to Be Deceptive and Misleading**
 Energy Plus appears to have engaged in a practice of deceptive marketing in order to persuade potential customers that Energy Plus's prices were reasonably comparable both to competitors' prices and to prevailing market rates. The complaints discussed herein clearly show the fruits of the company's marketing: customers believed that they would receive rates comparable to prevailing market rates, but were surprised to find themselves paying rates that were much higher, and in some instances more than twice the market rates."

● "**Energy Plus May Be Misleading Customers About its Promotional Rate**…
[W]hile Energy Plus states that its prices can change from month to month, it does not notify customers that the 10 percent savings will not continue during the variable pricing period, again potentially violating its obligation to make a full and fair disclosure of all of its offer conditions."

### ENERGY PLUS' POST-LITIGATION CONDUCT

71.    Since the onset of this and other class litigation relating to Energy Plus' marketing and pricing practices, it has sought to hide and cover up the conduct at issue in the cases and to prevent consumers from exercising their rights.  In particular, Energy Plus has scrubbed references to savings from its website. Its representatives have provided misinformation to customers – affirmatively stating that the company was under no legal obligation to honor its price claims. Further, these representatives have attempted to embarrass, intimidate, and silence complaining customers by implying they are exceptionally foolish for failing to understand that Energy Plus' rates were variable within its discretion and for thinking that the rates would generally be in line with those of the public utilities.  At the same time, Energy Plus has offered "courtesy" discounts and rebates in order to placate these customers and limit their damages. Commonly, these

discounts involve offers to lower a customer's rate to Energy Plus' commercial rate.

## CLASS ACTION ALLEGATIONS

72.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 to recover damages and other relief on behalf of themselves and a class of all Energy Plus customers with variable-rate plans from May 1, 2006 through the date of final judgment.   The class consists of four subclasses – (a) two multi-state common law subclasses, consisting of all variable-rate customers in Connecticut, Illinois, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Texas (1) who used Energy Plus Holdings LLC as their electricity supplier, and (2) who usedEnergy Plus Natural Gas LP as their natural gas supplier; and (b) two New Jersey statutory subclasses, consisting of all variable-rate customers in New Jersey (3) who used Energy Plus Holdings LLC as their electricity supplier, and (4) who used Energy Plus Natural Gas LP as their natural gas supplier.

73.     Defendants have engaged in an ongoing unlawful practice of deceptively inducing customers to switch energy providers to Energy Plus and to retain their Energy Plus accounts by misrepresenting that they will receive competitive market-based rates and/or will likely save money on average over their local public utilities or other alternative providers.

74.     This action is properly brought as a class action for the following reasons:

        (a)  The class consists of at least thousands of members and is so numerous that joinder of all members is impractical.

        (b)  There exist questions of law and fact common to the class which predominate over any questions affecting only individual members, including:

                (1) whether Defendants charged exorbitant undisclosed energy supply rates in violation of its representations to the class members;

                (2) whether Defendants' conduct violates the New Jersey Consumer Fraud Act,

(3)   whether Defendants' conduct violates the New Jersey Plain Language Act,

(4)   whether Defendants breached the implied covenant of good faith and fair dealing,

(5)   whether Defendants' breached their contracts with the class members,

(6)   whether Defendants' conduct has resulted in the unjust enrichment of Energy Plus, to the detriment of the class members, requiring restitution and/or disgorgement of unjustly retained monies,

(7)   whether Defendants should be enjoined from continuing their unlawful practices, and

(8)   whether Defendants are liable to the Class and the measure of damages.

(c)   Plaintiffs' claims are typical of the claims of the class.   In common with all class members, Plaintiffs were injured by Defendants' imposition of exorbitant undisclosed energy supply rates that were not commensurate with the market.   Plaintiffs have suffered the same kind of harm as other class members.

(d)   Plaintiffs have hired counsel able and experienced in class action litigation and will fairly and adequately protect the interests of the class.

(e)   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Individual damages to any one class member may be relatively small, making the expense of individual litigation prohibitive or impractical for class members.

73.   Additionally or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I

**(VIOLATION OF N.J.S.A. § 56:8-1, *ET SEQ*.,
NEW JERSEY CONSUMER FRAUD ACT)
New Jersey-Only Class**

### Affirmative Acts and Knowing Omissions

74.    Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint and incorporate such paragraphs by reference.

75.    Defendants Energy Plus Holdings LLC and Energy Plus Natural Gas LP have engaged in unfair, unlawful and deceptive acts in trade and commerce which have the capacity and tendency to deceive and, in fact, did deceive Plaintiffs and the class, and damaged Plaintiffs and class members.

76.    Defendants represented that their energy supply rates would be market-based and competitive and/or that customers would on average save money over their local public utilities and other alternative providers. Defendants' actual rates were excessive and unreasonable and bore no reasonable relationship to market conditions.

77.    Defendants committed an unlawful, deceptive, and unconscionable trade practice by inducing its customers to switch from other providers and/or to remain with Energy Plus and then proceeding to charge them exorbitant rates far out of line with Defendants' competitors.

78.    Defendants wrongfully concealed, suppressed, and omitted to disclose that its average rates were far higher than their competitors and that the main goal of the so-called "competitive" "market-based" pricing system was not to save money on behalf of Plaintiffs and the class members but to reap undue profits at their expense. While Defendants engendered the impression that all boats would rise together – that Energy Plus derived its business success from finding energy savings for the benefit of its consumer base – in fact, Energy Plus set itself up in an adversarial relationship with its customers, in which it would take advantage of them for as long as possible.

79.     Defendants' misrepresentations and omissions had the capacity to mislead Plaintiffs and the members of the class into believing (i) that Energy Plus' rates would be significantly lower than the amounts Energy Plus actually charged, and (ii) that these rates would be substantially equivalent to or better than the rates charged by Plaintiffs' and the class members' local public utilities.  Plaintiffs and the class members were injured as a result.

80.     Defendants' practices are grossly disproportionate with the industry.  Upon information and belief, most alternative energy suppliers do charge competitive market-based rates which generally meet or beat a customer's local public utility. On the occasions where a private supplier's rates are higher than the public utility, it is usually only by a very small percentage – not, as here, 30 to 200%.

81.     Because of Defendants' unlawful, deceptive, unfair, and unconscionable trade practice and scheme, Plaintiffs and other members of the class have suffered injury and damages in an amount to be determined at trial.  Pursuant to the New Jersey Consumer Fraud Act, this court has the power to enjoin the continuation of Defendants' conduct. Unless enjoined by this court, Defendants will continue their unlawful practice of charging excessive undisclosed rates on Energy Plus customers.

### *Per Se* **Statutory and Regulatory Violations**

82.      In addition to Defendants' misleading, deceptive, and unconscionable conduct, Energy Plus has engaged in statutory and regulatory breaches which are *per se* violations of the NJCFA.

83.     Defendants' bait-and-switch pricing scheme directly violates N.J.S.A. § 56:8-2.2, which states: "The advertisement of merchandise as part of a plan or scheme... not to sell the same at the advertised price is an unlawful act and a violation of the [NJCFA]."  Here, Defendants offer energy supplies at a price which will be commensurate with or undercut the market.  However, they have no intention of honoring their representations regarding price.  Energy Plus knows full well that it will jack up its rates after the first month and that they will invariably far exceed those of its competitors.

84.     Energy Plus' conduct also runs afoul of New Jersey's regulations against false advertising and thereby constitutes an automatic NJCFA violation.

85.     *First*, Defendants' ads violate N.J.A.C. 13:45A-9.2(a)(2). While the promotions indicate that consumers "Save up to 10%" by enrolling in Energy Plus and that its current rates are about 10% lower than those of the applicable public utilities, they omit a key "limiting factor": such savings are never possible after the first month.  Similarly, by citing the teaser rate as a basis for the savings claim, but concealing that a similar rate comparison cannot again be realized, Defendants essentially use a "fictitious former price" to tout their products – in violation of N.J.A.C 13:45A-9.6.  Consumers are induced to rely on a price claim that reasonably appears to have an indefinite term but is no longer applicable beginning with the second bill.

86.     *Second*, even Defendants' mild and inadequate caveats about variable pricing are not sufficiently "clear and conspicuous" in relation to their bold, upfront savings claims – in violation of N.J.A.C. 13:45A-9.2(a)(5).  By using a minimized type size and style and large, overly-verbose blocks of text, Energy Plus' disclaimers obscure material facts regarding its pricing claims.

87.     *Third*, Defendants make "false or misleading" assertions about the nature of and basis for price reductions – in violation of N.J.A.C. 13:45A-9.2(a)(9).  Instead of disclosing that the 10% savings claim is a teaser to bait the customer into its profit-grabbing scheme, the company represents that it is able to provide competitive prices and/or savings over the long term by combing the market daily for the best possible rates.

88.     *Fourth*, since Defendants' claims of potential future savings are untrue, Defendants cannot have provided "documents, records, or other written proof" substantiating these claims – in violation of N.J.A.C. 13:45A-9.2(a)(10).

89.     In addition, Energy Plus' advertisements and customer agreements violate the terms and

spirit of New Jersey's Plain Language Act, N.J.S.A. § 56:12-1, *et seq*.

## COUNT II

### (VIOLATION OF N.J.S.A. § 56:12-1, *ET SEQ*.,
### NEW JERSEY PLAIN LANGUAGE ACT)
### New Jersey-Only Class

90.     Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint and incorporate such paragraphs by reference.

91.     Under New Jersey's "Plain Language Act," consumer contracts are to be "written in a simple, clear, understandable and easily readable way." N.J.S.A. § 56:12-2. Examples of violations are listed in N.J.S.A. § 56:12-10: (1) Cross references that are confusing; (2) Sentences that are of greater length than necessary; (3) Sentences that contain double negatives and exceptions to exceptions; (4) Sentences and sections that are in a confusing or illogical order; (7) Contracts with sections that are not logically divided and captioned; (9) Conditions and exceptions to the main promise of the agreement that are not given equal prominence with the main promise, or are not in at least 10 point type. Energy Plus' contracts fail the plain language test.

92.     The Plain Language Act provides for actual damages, punitive damages (up to $50 per consumer and up to $10,000 per Defendant in a class action), and reasonable attorney's fees and costs (up to $2,500 per consumer and up to $10,000 per Defendant in a class action).   N.J.S.A. §§ 56:12-3; 56:12-4.  In addition, the court may reform or limit the provisions of a consumer contract to avoid unfair results, if: (a) a material provision of the contract violates the act, (b) the violation caused the customer to be substantially confused about any of the rights, obligations or remedies of the contract, (c) and the violation has caused or is likely to cause financial detriment to the consumer.  NJ.S.A. § 56:12-4.1.  Here, Defendants' confusing form contracts, especially taken in light of their other representations, led Plaintiffs and the class members to believe they would

28

receive competitive market-based prices and/or savings and not to comprehend that Energy Plus'
rates were not only variable but limitless and could reach exorbitant levels greatly exceeding the
market.  They were financially harmed as a result.

## COUNT III

**(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)**
**Multi-State Class of Energy Plus Customers in Connecticut, Illinois, Maryland,**
**Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Texas**

93.     Plaintiffs repeat and re-allege the allegations contained in the preceding and succeeding
paragraphs of this complaint and incorporate such paragraphs by reference.

94.     Every contractual arrangement inherently carries with it a covenant of good faith and fair
dealing.  Under this covenant, we are not to suppose that one party is put at the mercy of the other but
will read in any necessary conditions to ensure a mutuality of obligation under fair terms.

95.     When a contract contains an indefinite price term – such, as here, Defendants' variable
"market-based" pricing – the seller does not have unfettered discretion to set the price.  Rather, under
the covenant of good faith and fair dealing, the seller must set the price reasonably and in good faith.

96.     Here, Defendants have failed to satisfy this obligation.  Instead of setting their rates in good
faith in line with the market, Defendants have unilaterally imposed exorbitant undisclosed rates on its
customers, including Plaintiffs and the members of the class.  In actuality, Defendants' rates bear no
reasonable relationship to market conditions.  While Defendants represent that, on average, their rates
will be competitive with and/or undercut the market (as represented by the local public utilities that
most Energy Plus customers switch from), in reality Energy Plus rates generally far exceed that
market – by approximately 30% to as much as 200% per month.

97.     As the Connecticut Attorney General found, Energy Plus' rates do not fluctuate in accordance
with market conditions.  Regardless of what the market does, they generally remain on an upward

trend often with lengthy plateaus.  As seen in the above charts, Energy Plus' prices typically rose or remained constant even during periods when market rates declined.

98.     Energy Plus knows that its customers have an expectation of savings on their Energy Bills or at least of pricing competitive with the market.  Energy Plus is fully aware that its prices are invariably higher than the market would bear.  It sets its rates not in accordance with market factors but in order to continually maximize its profits at its customers' expense.

99.     Energy Plus' under-the-table offers of discounts and rebates to customers who complain about its rates are a strong indication that its regular prices are arbitrary and unreasonable and are not set in accordance with principles of good faith and fair dealing.  Even the discounted prices typically exceed prevailing market rates.  Energy Plus would not be able to offer highly substantial discounts to retain disgruntled customers were its original rates not grossly excessive.

100.    Under the covenant of good faith and fair dealing, the court should read in the applicable price properly paid by the class members for Energy Plus' services as a reasonable, market-based rate – that is, the rates charged by the class members' local public utilities during the class period.  All monies paid above this reasonable amount should be restored to the class as damages.

101.    Plaintiffs and the class have been damaged by Energy Plus' breach of the covenant of good faith in an amount to be determined at the trial of this action.

<u>**COUNT IV**</u>

**(BREACH OF CONTRACT)**
**Multi-State Class of Energy Plus Customers in Connecticut, Illinois, Maryland,**
**Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Texas**

102.    Plaintiffs repeat and re-allege the allegations contained in the preceding and succeeding paragraphs of this complaint and incorporate such paragraphs by reference.

103.    Where the relevant agreements between Energy Plus and its customers do not specify the

30

applicable price, to prevent the contract from being too indefinite or from placing Plaintiffs and the class at Defendants' mercy, the agreements should be deemed to contain an implied contractual term mandating a reasonable price.  In this case, a reasonable price would be the prevailing market rates in effect during the applicable class period.  The best approximation of such a reasonable, market price is the rates charged by the class members' local public utilities.

104.    Defendant Energy Plus breached this implied contractual term by charging Plaintiffs and the class members unreasonable and exorbitant prices well above prevailing market rates.

105.    Plaintiffs and the class have been damaged by Energy Plus' breach of contract in an amount to be determined at the trial of this action.

## COUNT V

### (UNJUST ENRICHMENT)
**Multi-State Class of Energy Plus Customers in Connecticut, Illinois, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Texas**

106.    Plaintiffs repeat and re-allege the allegations contained in the preceding and succeeding paragraphs of this complaint and incorporate such paragraphs by reference.

107.    Because of the wrongful activities described above, including charging Plaintiffs exorbitant undisclosed rates grossly out of line with market conditions, Defendants have received money belonging to the Plaintiffs and the class.

108.    By collecting exorbitant and unreasonable rates from Energy Plus customers, Defendants have benefited from receipt of the excessive rates, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

109.    Defendants have reaped illegal profits and unjustly enriched themselves at the expense of Plaintiffs and class members.

110.    As a result of Defendants' imposition of these excessive and unreasonable energy rates,

31

Defendants must account to the Plaintiffs and class members for such unjust enrichment and disgorge their unlawful profits as restitution to the class.

111.   By reason of the foregoing, Plaintiffs and the class have suffered money damages in an amount to be determined at the trial of this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs and the class pray for judgment:

A.   declaring this action to be maintainable as a class action;

B.   appointing Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.   awarding compensatory damages to Plaintiffs and the class members;

D.   awarding treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

E.   enjoining defendants from continuing to implement their unlawful and illegal trade practices and schemes, and granting all injunctive relief  appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing;

F.   awarding Plaintiffs all costs and disbursements, including attorneys' fees, experts' fees, and other class action related expenses;

G.   awarding pre-judgment and post-judgment interest to Plaintiffs and the class members on their damages; and

H.   granting such other and further relief as may be just and proper.

## <u>Jury Demand</u>

Plaintiffs and the class demand a trial by jury of all issues.

Dated:    October 5, 2012

SANFORD HEISLER, LLP

By:         <u>      s/ Jennifer Siegel                    </u>
Jennifer Siegel  (JS-6110)

Jeremy Heisler
Andrew Melzer
Grant E. Morris (Of Counsel)
1350 Avenue of the Americas, 31st Fl.
New York, NY 10019
Tel: (646) 402-5650
Fax: (646) 402-5651
jsiegel@sanfordheisler.com
jheisler@sanfordheisler.com
amelzer@sanfordheisler.com

MATTHEW R. MENDELSOHN
David A. Mazie
MAZIE SLATER KATZ & FREEMAN, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 228-9898
dmazie@mskf.net
mmendelsohn@mskf.net

JOSEPH G. SAUDER
Matthew D. Schelkopf
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
JGS@chimicles.com
MDS@chimicles.com
BFJ@chimicles.com

*Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I, Jennifer Siegel, hereby certify under penalty of perjury that on this 5th day of October 2012 true and correct copies of the foregoing Plaintiffs' Second Amended Complaint were served on all counsel of record by ECF.

_____s/ Jennifer Siegel_____
